UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNIKEN U. DAVENPORT | : | Case Number |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| EXPERIAN INFORMATION | : | |
| SOLUTIONS, INC. | : | CIVIL COMPLAINT |
| Defendant | : | JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

**COMES NOW,** Plaintiff, Anniken U. Davenport, by and through her undersigned counsel, Steven Howell, Esquire of the Howell Law Firm, complaining of Defendant as follows:

**I. INTRODUCTORY STATEMENT**

1. Plaintiff, Anniken U. Davenport (hereinafter referred to as "Davenport"), is an adult natural person and she brings this action for damages against the Defendant for violations of the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681 *et sec., as amended.*

2. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public's confidence, which is essential to the continued functioning of the banking system. An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character and general reputation of consumers. Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on customers. There is a

compelling need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's rights.

3. The Date of 1st Delinquency (hereinafter referred to as "DOFD") is defined by the FCRA § 1681c(c)(1) to be the month and year of the commencement of the delinquency on the account that immediately preceded the credit account being placed for collection, charged to profit or loss, or subjected to any similar action.

4. The DOFD is materially important to consumers because it determines the "age" of delinquency.

5. Under credit scoring, more recently reported delinquencies operate to lower a person's credit score as compared to older delinquencies.

6. Without the disclosure of proper DOFD, consumers cannot dispute inaccurate information about the "age" of their accounts and, therefore, are subject to low, inaccurate credit scores.

7. On November 19, 2020, Davenport was denied a mortgage based in part on the Defendant, Experian Information Solutions, Inc. (hereinafter referred to as "Experian") reporting the following inaccurate negative comments (Exhibit S): (1) code #10 – Proportion of balance to high credit on bank revolving or all revolving accounts; (2) code #15 – lack of recent bank/national revolving information; (3) code #18 – number of accounts with delinquency; (4) code #09 – too many accounts recently open.

## II. JURISDICTION

8. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1337.

9. Venue in this district is proper in that Davenport resides in this District.

### III. PARTIES

10. Davenport is an adult individual with an address of 313 Verbeke Street, Harrisburg Pennsylvania 17070.

11. Experian, at all times relevant hereto, is and was a corporation engaged in the business of nationwide consumer reporting with an address of 955 American Lane, Schaumburg, Illinois 60173.

### IV. FACTUAL ALLEGATIONS OF DAVENPORT'S INITIAL DISCOVERY OF THE INACCURACIES IN HIS CREDIT REPORT HISTORY

12. On December 21, 2018 Davenport was declined credit for a purchase of a vehicle.

13. After being declined credit for a vehicle, Davenport obtained her September 24, 2019 Credit Report #1709xxx (Exhibit A-1) from Experian and discovered inaccurate credit information being reported regarding multiple tradelines.

### V. FACTUAL ALLEGATIONS AS TO EXPERIAN'S FLAWED INVESTIGATION INTO DAVENPORT'S INACCURATE CREDIT INFORMATION CLAIM REGARDING THE BUREAU OF ACCOUNT MANAGEMENT

14. Experian's practices related to compiling and distributing consumer credit information are governed by the FCRA. The FCRA requires Experian to maintain reasonable procedures to assure maximum possible accuracy of consumer credit information. 15 U.S.C. § 1681e.

15. Title 15 U.S.C. § 1681i authorizes Davenport to dispute information in her credit report.

16. When a dispute is made, Experian must conduct a reasonable reinvestigation of disputed information. In conducting a reinvestigation of disputed information, Experian is required to "review and consider all relevant information submitted by the

consumer" with respect to such disputed information. 15 U.S.C. § 1681i(a)(4). If, after a reinvestigation, the information is found to be inaccurate, incomplete or cannot be verified, Experian must promptly delete or modify the information as appropriate. 15 U.S.C. §1681i(a)(5).

17. Davenport obtained her September 24, 2019 credit report history from Experian and discovered inaccurate credit information being reported regarding thirty-seven (37) Bureau of Account Management (hereinafter referred to as "BAM") tradelines (Exhibit A-1).

18. Effective September 15, 2017 the three largest consumer reporting agencies (Experian, Equifax and TransUnion) shall no longer report medical debts that are less than one hundred and eighty (180) days past the DOFD. The rule changes are part of the March 2015 settlement with the Attorney General of New York (hereinafter referred to as "AGNY Settlement") and other states including Pennsylvania. The AGNY Settlement states on page 13 of 41 (Exhibit B):

> To allow appropriate time for insurance remediation and clarity on what a consumer's individual payment obligation is for a medical account, the CRAs (Credit Reporting Agencies) shall prevent the reporting and display of medical debt identified and furnished by Collection Furnishers when the date of first delinquency is less less than one hundred and eighty (180) days prior to the date that account is reported to the CRS.

19. As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "ACDV" shall mean Automated Credit Dispute Verification, an automated dispute form that is initiated by a CRA on behalf of a consumer and routed to the appropriate furnisher for review and update or verification.

20. As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "AUD" shall mean Automated Universal Data, an automated form used for out-of-cycle credit history updates that is initiated by the furnisher.

21. Experian and the Bureau of Account Management (hereinafter referred to as "BAM") use a system known as e-OSCAR to send and receive ACDV's and AUD's. As defined in the AGNY Settlement on page 9 of 41 (Exhibit B), "e-OSCAR shall mean the 'Online Solution for Complete and Accurate Reporting,' a browser-based system for conveying consumer disputes to furnishers and for furnishers to convey the results of their investigation to the CRAs, designed in part in furtherance of compliance with the FCRA, 15 U.S.C. § 1681i(a)(5)(D)."

22. When Experian receives a dispute regarding the accuracy of a credit report an ACDV will be completed by Experian and sent, via the e-OSCAR system, to the furnisher of the credit information that is in dispute.

23. In response to finding inaccurate credit information on Davenport's September 24, 2019 Experian Credit Report #1709xxx (Exhibit A-1) for the thirty-seven (37) BAM tradelines, Davenport sent a November 12, 2019 dispute letter (Exhibit C-1) to Experian NCAC (hereinafter referred to as "Experian").

24. Experian signed for Davenport's November 12, 2019 dispute letter on November 20, 2019 (Exhibit C-2).

25. Upon information and belief, on or about November 19, 2019, BAM sent thirty-seven (37) AUDs to Experian reporting that BAM's thirty-seven (37) tradelines are deleted.

26. Upon information and belief, Experian did not send a single ACDV to BAM because Experian received BAM's thirty-seven (37) AUDs on or about November 19, 2019 reporting that BAM's thirty-seven (37) tradelines are deleted before receiving on November 20, 2019, Davenport's November 12, 2019 letter (Exhibit C-1).

27. Upon information and belief, between November 19, 2019 and November 26, 2019, Experian deleted BAM's thirty-seven (37) tradelines from Davenport's Experian credit history.

28. Experian did not provide Davenport notification of the date the thirty-seven (37) BAM Tradelines were deleted.

29. Experian's notification of the deletion of the thirty-seven (37) BAM Tradelines would be very similar to Experian's notification of the deletions of the BAM Tradelines reported in Albert F. Davenport's (Davenport's husband) November 30, 2019 Experian Dispute Results Report #1579xxx (Exhibit K-1).

30. The Consumer Financial Protection Bureau's ("CFPB") February 27, 2014 Bulletin cautioned against a furnisher simply deleting tradelines in response to a consumer dispute without conducting an investigation.

31. CFPB Bulletin 2014-01 at 2 warns furnishers that they should not assume simply deleting a disputed item will constitute a reasonable investigation.

32. Experian's November 26, 2019 Dispute Results Report #1714xxx (Exhibit A-3) did not report the thirty-seven (37) BAM Tradelines.

33. Experian's November 26, 2019 Dispute Results Report #0908xxx (Exhibit A-4) did not report the thirty-seven (37) BAM Tradelines.

34. On December 11, 2019, a dispute letter (Exhibit D-1) was sent to Experian requesting the dispute results notification to Davenport that deleted BAM's thirty-seven (37) tradelines.

35. Experian signed for the December 11, 2019 dispute letter on December 16, 2019 (Exhibit D-2).

36. Experian's employee, Bobby Baker, sent a January 8, 2020 letter (Exhibit E-1) that states: "Our records indicate that the Bureau of Account Management and Capio Partners, LLC account do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review"

37. Experian did not send an Experian credit report, it sent a January 8, 2020 Dispute Results Report #2040xxx (Exhibit A-6).

38. Bobby Baker's January 8, 2020 letter (Exhibit E-1) and Experian's January 8, 2020 Dispute Results Report #2040xxx (Exhibit A-6) failed to provide a date when the thirty-seven (37) BAM Tradelines were deleted.

39. In response, a January 27, 2020 letter (Exhibit F-1) was faxed to Bobby Baker that requested: "Please provide a response to the requests per my December 11, 2019 letter."

40. In response, Bobby Baker faxed a February 3, 2020 letter (Exhibit E-2).

41. Bobby Baker's February 3, 2020 letter (Exhibit E-2) states: "Our records indicate that the Tradeline accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

42. Experian did not send an Experian credit report, it sent a February 3, 2020 Dispute Results Report #3061xxx (Exhibit A-8).

43. Bobby Baker's February 3, 2020 letter (Exhibit E-2) and Experian's February 3, 2020 Dispute Results Report #3061xxx (Exhibit A-8) failed to provide a date when the thirty-seven (37) BAM Tradelines were deleted.

44. Bobby Baker's faxed February 10, 2020 letter (Exhibit E-3) states: "Our records indicate that the Tradeline accounts do not appear on your client's current Experian

credit report. We have mailed a current Experian credit report directly to your client for review."

45. Experian did not send an Experian credit report, it sent a February 10, 2020 Dispute Results Report #0780xxx (Exhibit A-9).

46. Bobby Baker's February 10, 2020 letter (Exhibit E-3) and Experian's February 10, 2020 Dispute Results Report #0780xxx (Exhibit A-9) failed to provide the date when the thirty-seven (37) BAM Tradelines were deleted.

47. In response to Bobby Baker's February 3, 2020 and February 10, 2020 letters, a February 17, 2020 letter (Exhibit F-2) was faxed to Bobby Baker.

48. The February 17, 2020 letter (Exhibit F-2) requested the name of the tradelines referenced in Bobby Baker's February 3, 2020 and February 10, 2020 letters.

49. Bobby Baker's February 29, 2020 faxed letter (Exhibit E-4) provides no names of the tradelines referenced in Baker's February 3, 2020 and February 10, 2020 letters and does not provide a date the thirty-seven (37) BAM Tradelines were deleted.

50. Bobby Baker's February 29, 2020 faxed letter (Exhibit E-4) "Therefore, we disclose the personal credit profile only to the requesting consumer who is the subject of the information. We have mailed a current Experian credit report directly to the consumer for review."

51. Experian sent a February 29, 2020 Credit Report #2392xxx (Exhibit A-11).

52. Bobby Baker's February 29, 2020 letter (Exhibit E-4) and Experian's February 29, 2020 Credit Report #2392xxx (Exhibit A-11) failed to provide the date when the thirty-seven (37) BAM Tradelines were deleted.

53. Experian failed to conduct a reasonable investigation since Experian has not provided the date when it deleted the thirty-seven (37) BAM Tradelines.

54. The AGNY Settlement on Pages 30 and 31 of 41 Section III Affirmative Obligations and Prohibitions – E. Furnishing Monitoring – 4. Functions of the Working Group (Exhibit B):

> a.        Coordinate and Review Furnisher Analytics and Metric: The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to: on an industry basis (e.g., collections, student loans); on a time-series basis by industry (i.e., a trending analysis that examines data over an extended time period); and/or in the form of benchmarking reports. These reports and metrics may include, but are not limited to, the following topics and purposes:
>
> v.        Proposed changes to the CRA's existing policies and procedures related to data accuracy and furnisher monitoring based on any areas of concern and/or best practices identified by the working Group pursuant to Section III.E.4.b.
>
> b.        Identify Data Accuracy Best Practices: The Working Group shall discuss each CRA's policies and procedures pertaining to data accuracy and furnishers in order to identify best practices. The Working Group's discussion may include, but not be limited to, topics addressed in Sections III. A and B above, including: minimum identification elements on newly opened trade and collection data; uniform standards regarding the collection of public record data; additional types of consumer disputes that warrant escalated handling; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; and other policies and procedures designed to enhance data quality. The Working Group shall identify potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy.

55. Experian failed to monitor BAM for data quality and accuracy.

56. Upon information and belief, Experian's EPC Sorter Manual describes how to sort the incoming mail.

57. Upon information and belief, Experian's sorters check the verbiage on an imaged correspondence to determine if the request or information is related to a Consumer Affairs Special Services (hereinafter referred to as "CASS") issue.

58. Upon information and belief, lawsuit complaints and requests for compensation or settlement received directly from attorneys are CASS related issues and correspondences.

59. An April 27, 2020 letter (Exhibit G-1) was sent to Experian's Group General Counsel, Darryl Gibson.

60. Experian picked up the April 27, 2020 letter on April 30, 2020 as per the USPS Tracking (Exhibit G-2).

61. Bobby Baker's May 28, 2020 faxed response letter (Exhibit G-3) states: "Additionally, our records indicate that Bureau of Account Management, Capio Partners, LLC, Portfolio Recovery Associates and JPMCB Card accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

62. Experian did not send a current Experian credit report, it sent a May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12).

63. Experian's CASS system did not provide a response to the April 27, 2020 letter (Exhibit G-1) that requested compensation and/or settlement for Experian's FCRA violations that were committed as outlined in the April 27, 2020 letter.

64. Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the April 27, 2020 letter (Exhibit G-1) because there is no response to the April 27, 2020 settlement offer.

65. Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the disputes referenced in the April 27, 2020 letter (Exhibit G-1).

66. The AGNY Settlement on Page 21 of 41 Section III Affirmative Obligations and Prohibitions – B. The Dispute Process – 6. Enhancing e-OSCAR Furnisher Certifications and Terms of Use (Exhibit B):

> a. The CRAs shall review and update the terms of use agreed to by furnishers using e-OSCAR, as well as the ACDV and AUD certifications made by furnishers through e-OSCAR, in order to: (i) emphasize compliance with furnishers' obligations under the FCRA; (ii) reinforce furnishers' obligations to review and consider images of documents submitted by consumers as part of the furnishers' reinvestigation of consume disputes; and (iii) incorporate recent regulatory guidance from the CFPB advising furnishers of their responsibilities concerning handling and investigating consumer disputes. At a minimum, the furnisher certifications prior to submitting an ACDV [or AUD, as applicable], you certify that you have reviewed and considered all associated images, you have verified the accuracy of the data compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect any changes needed.

67. The AGNY Settlement on Page 32 of 41 Section III Affirmative Obligations and Prohibitions – E. Furnisher Monitoring – 5. Corrective Action Against Certain Furnishers (Exhibit B):

> a. Each CRA shall implement policies to monitor the performance of individual furnishers and categories of furnishers based on the recommendation of the Working Group and/or CRA's own initiative.

68. Upon information and belief, Experian's Dispute: Trades Participant Guide describes how to handle disputes.

69. Upon information and belief, Experian's policy is to purge most negative information appearing on a consumer's credit report six years and nine months from the original DOFD reported on the account.

70. Upon information and belief, Experian will purge an account six years and six months from the DOFD if an account is reported as being in a derogatory state (charge off or collection) and the only account history array entries are the derogatory State Codes.

71. Upon information and belief, Experian's account history array is used to display a consumer's payment history, usually month by month, for a tradeline.

72. Upon information and belief, Experian's derogatory State Codes represent the condition or payment state of a tradeline.

73. Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) reports the thirty seven (37) BAM Tradelines in a derogatory state (collections) and the account history arrays are the derogatory State Codes (C – collections).

74. Upon information and belief, Experian prefers to delete a tradeline rather than update the tradeline with an incorrect DOFD.

75. Penn State Health (hereinafter referred to as "PSH") provided Davenport the date of service and first billing statement (Exhibit H) for the account sent to BAM.

76. Pursuant to the AGNY Settlement, effective September 15, 2017, Experian shall no longer report medical debts that are less than one hundred and eighty (180) days past the DOFD.

77. The following chart documents Experian's purge date (based on six years and six months from the DOFD) and estimates the DOFD to calculate the date that is 180 days after the DOFD in order to compare the date that Experian first reported the BAM Tradeline:

| Ex. H PSH Date of Service | Ex. A-1 BAM Tradeline | Ex. A-1 Experian Date No Longer Reporting Purge Date | 6 Years 6 Months Est. DOFD For Experian's Purge Date | Experian Can Report the Tradeline 180 Days After the Est. DOFD | Experian First Reported BAM Tradeline As Reported In Ex. A-1 |
|---|---|---|---|---|---|
| 9/19/17 | xxxx3157 | 7/2024 | 1/2018 | 7/2018 | 5/2018 |
| 9/22/17 | xxxx3575 | 7/2024 | 1/2018 | 7/2018 | 5/2018 |
| 9/27/17 | xxxx1781 | 7/2024 | 1/2018 | 7/2018 | 5/2018 |
| 11/3/17 | xxxx2563 | 9/2024 | 3/2018 | 9/2018 | 6/2018 |
| 12/4/17 | xxxx6144 | 10/2024 | 4/2018 | 10/2018 | 8/2018 |
| 12/5/17 | xxxx6143 | 10/2024 | 4/2018 | 10/2018 | 8/2018 |
| 2/16/18 | xxxx1951 | 12/2024 | 6/2018 | 12/2018 | 10/2018 |
| 4/28/48 | xxxx0377 | 2/2025 | 8/2018 | 2/2019 | 12/2018 |
| 4/30/18 | xxxx5869 | 2/2025 | 8/2018 | 2/2019 | 12/2018 |
| 5/17/18 | xxxx1964 | 3/2025 | 9/2018 | 3/2019 | 1/2019 |

78. Based on the DOFD for the 6 years and 6 months purge date, Experian reported the BAM Tradelines less than 180 days past the DOFD.

79. Experian reporting a medical tradeline less than the 180 days past the DOFD is a violation of the AGNY Settlement.

80. Experian failed to have policies and procedures in place to prevent BAM from reporting tradelines to Experian with inaccurate DOFDs.

81. Experian failed to prevent the reporting and displaying of medical debt identified and furnished by BAM with inaccurate DOFDs.

82. In the alternative, Experian failed to implement policies to monitor and train BAM to report accurate DOFDs.

83. The following chart documents Experian's purge date (based on six years and nine months from the original DOFD) and calculates the DOFD to calculate the date that is 180 days after the DOFD in order to compare the date that Experian first reported the BAM Tradeline.

| Ex. H PSH Date of Service | Ex. A-1 BAM Tradeline | Ex. A-1 Experian Date No Longer Reporting Purge Date | 6 Years 9 Months Est. DOFD For Experian's Purge Date | Experian Can Report the Tradeline 180 Days After the Est. DOFD | Experian First Reported BAM Tradeline As Reported In Ex. A-1 |
|---|---|---|---|---|---|
| 9/19/17 | xxxx3157 | 7/2024 | 10/2017 | 4/2018 | 5/2018 |
| 9/22/17 | xxxx3575 | 7/2024 | 10/2017 | 4/2018 | 5/2018 |
| 9/27/17 | xxxx1781 | 7/2024 | 10/2017 | 4/2018 | 5/2018 |
| 11/3/17 | xxxx2563 | 9/2024 | 12/2017 | 6/2018 | 6/2018 |
| 12/4/17 | xxxx6144 | 10/2024 | 1/2018 | 7/2018 | 8/2018 |
| 12/5/17 | xxxx6143 | 10/2024 | 1/2018 | 7/2018 | 8/2018 |
| 2/16/18 | xxxx1951 | 12/2024 | 3/2018 | 9/2018 | 10/2018 |
| 4/28/48 | xxxx0377 | 2/2025 | 5/2018 | 11/2018 | 12/2018 |
| 4/30/18 | xxxx5869 | 2/2025 | 5/2018 | 11/2018 | 12/2018 |
| 5/17/18 | xxxx1964 | 3/2025 | 6/2018 | 12/2018 | 1/2019 |

84. Based on the DOFD for the 6 years and 9 months purge date, Experian reported inaccurate DOFD based the PSH's date of service.

85. Experian allowed BAM to report inaccurate DOFD in order to report a medical tradeline less than the 180 days past the DOFD, which is a violation of the AGNY Settlement.

86. Experian failed to have policies and procedures in place to prevent BAM from reporting tradelines to Experian with inaccurate DOFDs.

87. Experian failed to prevent the reporting and displaying of medical debt identified and furnished by BAM with inaccurate DOFDs.

88. In the alternative, Experian failed to implement policies to monitor and train BAM to report accurate DOFDs.

89. Experian's and BAM's ACDVs will provide the documentation of the DOFD for each BAM Tradeline.

90. Experian's "parroting" the information provided by BAM may be considered a willful violation of the FCRA as the court opined in *Campbell v. Chase Manhattan Bank, USA, N.A.*, No. 02-3489, 005 WL 1514221, 16 (D. N.J. June 2005):

> "...parroting information received from original source may be considered a willful violation of the FCRA."

### VI. FACTUAL ALLEGATIONS AS TO EXPERIAN'S FLAWED INVESTIGATION INTO DAVENPORT'S INACCURATE CREDIT INFORMATION CLAIM REGARDING CAPIO PARTNERS LLC

91. Experian's practices related to compiling and distributing consumer credit information are governed by the FCRA. The FCRA requires Experian to maintain reasonable procedures to assure maximum possible accuracy of consumer credit information. 15 U.S.C. § 1681e.

92. Title 15 U.S.C. § 1681i authorizes Davenport to dispute information in her credit report.

93. When a dispute is made, Experian must conduct a reasonable reinvestigation of disputed information. In conducting a reinvestigation of disputed information, Experian is required to "review and consider all relevant information submitted by the consumer" with respect to such disputed information. 15 U.S.C. § 1681i(a)(4). If, after a reinvestigation, the information is found to be inaccurate, incomplete or cannot be verified, Experian must promptly delete or modify the information as appropriate. 15 U.S.C. §1681i(a)(5).

94. As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "ACDV" shall mean Automated Credit Dispute Verification, an automated dispute form that is initiated by a CRA on behalf of a consumer and routed to the appropriate furnisher for review and update or verification.

95. As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "AUD" shall mean Automated Universal Data, an automated form used for out-of-cycle credit history updates that is initiated by the furnisher.

96. Experian and Capio Partners, LLC (hereinafter referred to as "CPL") use a system known as e-OSCAR to send and receive ACDV's and AUD's. As defined in the AGNY Settlement on page 9 of 41 (Exhibit B), "e-OSCAR shall mean the 'Online Solution for Complete and Accurate Reporting,' a browser-based system for conveying consumer disputes to furnishers and for furnishers to convey the results of their investigation to the CRAs, designed in part in furtherance of compliance with the FCRA, 15 U.S.C. § 1681i(a)(5)(D)."

97. When Experian receives a dispute regarding the accuracy of a credit report an ACDV will be completed by Experian and sent, via the e-OSCAR system, to the furnisher of the credit information that is in dispute.

98. On November 12, 2019, a dispute letter (Exhibit I-1) was sent to Experian regarding the DOFD being reported in CPL's Tradelines #15810xxx and #14161xxx.

99. Experian signed for the November 12, 2019 dispute letter on November 15, 2019 (Exhibit I-2).

100.   In response, Experian sent a November 26, 2019 Dispute Results Report #1714xxx (Exhibit A-3) that reports: "Here are your results – Still pending – Capio Partners LLC 1416157 – Projected completion date Dec 14, 2019."

101.   In response, Experian sent a November 26, 2019 Dispute Results Report #0908xxx (Exhibit A-4) that reports: "Here are your results – Credit Items – Capio Partners LLC 1416157 Outcome: Deleted."

102.   The following Experian's Reports have reported the CPL Tradelines #14161xxx and #15810xxx:

| CPL Tradeline # | 9/24/19 Experian Report #1709xxx Ex. A-1 | 11/6/19 Experian Report #3456xxx Ex. A-2 | 11/26/19 Experian Report #1714xxx Ex. A-3 | 11/26/19 Experian Report #0908xxx Ex. A-4 |
|---|---|---|---|---|
| 14161xxx | Reported | Reported | Reported | Not Reported |
| 15810xxx | Reported | Reported | Not Reported | Not Reported |

103.   Experian provides no notification for the deletion of the CPL Tradeline #15810xxx.

104.   On December 11, 2019, a dispute letter (Exhibit D-1) was sent to Experian.

105.   Experian signed for the December 11, 2019 dispute letter on December 16, 2019 (Exhibit D-2).

106.   The December 11, 2019 dispute letter (Exhibit D-1) requested a copy of Experian's notification sent to Davenport reporting the deletion of CPL Tradeline #15810xxx.

107.   In response, Experian's employee, Bobby Baker, sent a January 8, 2020 letter (Exhibit E-1) that states: "Our records indicate that the Bureau of Account Management and Capio Partners, LLC accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client."

108.   Experian did not send a current Experian credit report, it sent a January 8, 2020 Dispute Results Report #0240xxx-30 (Exhibit A-6)

109.   A January 27, 2020 faxed letter (Exhibit F-1) was sent to Bobby Baker that requested: "Please provide a response to the requests per my December 11, 2019 letter."

110.   Experian has not conducted a reasonable investigation since Experian has not provided a response with a notification and date it deleted CPL Tradeline #15810xxx.

111.   The AGNY Settlement states on page 13 of 41 (Exhibit B):

> b. The CRAs shall instruct Collection Furnishers on the use of the Metro 2 special comment codes of "BP" for debt identified as "paid by insurance" and "AB" for debt identified as "being paid by insurance" and instruct Collection Furnishers to remove or suppress medical accounts reported as "paid by insurance" or "being paid by insurance" if such accounts were in fact paid in full by the consumer's insurance carrier and were not the obligation of the consumer.
> c. The CRS shall implement a process designed to remove or suppress known medical collections furnished by Collection Furnishers from files within the CRAs respective credit reporting databases when such debt is reported either as having been paid in full by insurance or as being paid by insurance.

112.   Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) Status section reports CPL Tradelines #14161xxx and #15810xxx were paid and closed as of Mar 2018.

113.   Upon information and belief, CPL Tradelines #14161xxx and #15810xxx were paid by insurance.

114.   Upon information and belief, Holy Spirit Hospital reported to CPL that the medical debt of $387.00 (CPL Tradeline #15810xxx) and $2,415.00 (CPL Tradeline #14161xxx) was paid by insurance since Experian's September 24, 2019 Credit Report (Exhibit A-1) reports the CPL Tradelines #15810xxx and #14161xxx were closed on March 2018.

115.   Experian has failed to instruct CPL on the use of Metro 2 special comment code "BP" (paid by insurance) for medical debt tradelines that were paid by insurance.

116.   Experian has failed to implement a process designed to remove or suppress known medical collections furnished by Collection Furnishers having been paid in full by insurance from within its credit reporting database.

117.   The AGNY Settlement on Page 12 of 41 Section III Affirmative Obligations and Prohibitions – A. Data Accuracy and Quality – 1. Reporting of Collection Data (Exhibit B):

> e.   The CRA's shall require Collection Furnishers to regularly reconcile data relating to accounts in collection that have not been paid in full. This regular reconciliation will be accomplished, in part, by periodic removal or suppression of all collection accounts that have not been updated by the Collection Furnisher within the last six months. In addition, the CRAs shall revise training materials and instruct new and existing Collection Furnishers on accurately reporting and deleting accounts that are sold, transferred, or no longer managed by the reporting entity.

118.   Upon information and belief, CPL reported the CPL Tradelines #15810xxx and #14161xxx as collection accounts to Experian. CPL must, within 90 days after

reporting the collection accounts to Experian, provide Experian the month and the year of the commencement of the delinquency that immediately preceded the action, so Experian will know how long to keep the information in Davenport's file. See 15 U.S.C. § 1681s-2(a)(5).

119.    Upon information and belief, Experian when it reports a negative tradeline will insert the following wording under the Status Section of the consumer's report: "This account is scheduled to continue on the record until [the date Experian calculates from the DOFD that it will no longer report the tradeline]."

120.    Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) does not report a date when CPL Tradelines #14161xxx and #15810xxx will no longer be reported in Experian's credit report history.

121.    If CPL did not provide Experian with a DOFD, Experian failed to have the written policies and procedures in place to delete CPL Tradelines #14161xxx and #15810xxx when CPL failed to provide a DOFD within 90 days of reporting the tradelines to Experian

122.    Upon information and belief, CPL's initial notifications of the DOFD for CPL Tradeline #15810xxx and #14161xxx to Experian will provide the documentation of the DOFD CPL did or did not report to Experian.

123.    Upon information and belief, Experian's Dispute: Trades Participant Guide describes how to handle disputes.

124.    Upon information and belief, Experian prefers to delete a tradeline rather than update the tradeline with an incorrect DOFD.

125.   Upon information and belief, Experian will err on the side of the consumer by removing a tradeline if Experian does not know the DOFD.

126.   Upon information and belief, Experian's EPC Sorter Manual describes how to sort the incoming mail.

127.   Upon information and belief, Experian's sorters check the verbiage on an imaged correspondence to determine if the request or information is related to a Consumer Affairs Special Services (hereinafter referred to as "CASS") issue.

128.   Upon information and belief, lawsuit complaints and requests for compensation or settlement received directly from attorneys are CASS related issues and correspondences.

129.   An April 27, 2020 demand letter (Exhibit G-1) was sent to Experian's Group General Counsel, Darryl Gibson.

130.   Experian picked up the April 27, 2020 demand letter on April 30, 2020 as per the USPS Tracking (Exhibit G-2).

131.   Bobby Baker's May 28, 2020 faxed response letter (Exhibit G-3) states: "Additionally, our records indicate that Bureau of Account Management, Capio Partners, LLC, Portfolio Recovery Associates and JPMCB Card accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

132.   Experian did not send a current Experian credit report, it sent a May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12).

133.   Experian's CASS system did not provide a response to the April 27, 2020 letter (Exhibit G-1) that requested compensation and/or settlement for Experian's FCRA violations that were committed as outlined in the April 27, 2020 letter.

134.   Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the April 27, 2020 letter (Exhibit G-1) because there is no response to the April 27, 2020 settlement offer.

135.   Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the disputes referenced in the April 27, 2020 letter (Exhibit G-1).

136.   The AGNY Settlement states on Pages 30 and 31 of 41 Section III Affirmative Obligations and Prohibitions – E. Furnishing Monitoring – 4. Functions of the Working Group (Exhibit B):

> a.       Coordinate and Review Furnisher Analytics and Metric: The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to: on an industry basis (e.g., collections, student loans); on a time-series basis by industry (i.e., a trending analysis that examines data over an extended time period); and/or in the form of benchmarking reports. These reports and metrics may include, but are not limited to, the following topics and purposes:
>         v.       Proposed changes to the CRA's existing policies and procedures related to data accuracy and furnisher monitoring based on any areas of concern and/or best practices identified by the working Group pursuant to Section III.E.4.b.
> b.       Identify Data Accuracy Best Practices: The Working Group shall discuss each CRA's policies and procedures pertaining to data accuracy and furnishers in order to identify best practices. The Working Group's discussion may include, but not be limited to, topics addressed in Sections III. A and B above, including: minimum identification elements on newly opened trade and collection data; uniform standards regarding the collection of public record data; additional types of consumer disputes that warrant escalated handling; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; and other policies and procedures designed to enhance data quality. The Working Group shall identify potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy.

137.   Experian failed to monitor CPL for data quality and accuracy.

138.   Experian's "parroting" the information provided by CPL may be considered a willful violation of the FCRA as the court opined in *Campbell v. Chase Manhattan Bank, USA, N.A.*, No. 02-3489, 005 WL 1514221, 16 (D. N.J. June 2005):

> "...parroting information received from original source may be considered a willful violation of the FCRA."

## VII. FACTUAL ALLEGATIONS AS TO EXPERIAN'S FLAWED INVESTIGATION INTO DAVENPORT'S INACCURATE CREDIT INFORMATION CLAIM REGARDING NAVIENT

139.   Experian's practices related to compiling and distributing consumer credit information are governed by the FCRA. The FCRA requires Experian to maintain reasonable procedures to assure maximum possible accuracy of consumer credit information. 15 U.S.C. § 1681e.

140.   Title 15 U.S.C. § 1681i authorizes Davenport to dispute information in her credit report.

141.   When a dispute is made, Experian must conduct a reasonable reinvestigation of disputed information. In conducting a reinvestigation of disputed information, Experian is required to "review and consider all relevant information submitted by the consumer" with respect to such disputed information. 15 U.S.C. § 1681i(a)(4). If, after a reinvestigation, the information is found to be inaccurate, incomplete or cannot be verified, Experian must promptly delete or modify the information as appropriate. 15 U.S.C. §1681i(a)(5).

142.   As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "ACDV" shall mean Automated Credit Dispute Verification, an automated dispute form that is

initiated by a CRA on behalf of a consumer and routed to the appropriate furnisher for review and update or verification.

143.   As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "AUD" shall mean Automated Universal Data, an automated form used for out-of-cycle credit history updates that is initiated by the furnisher.

144.   Experian and Navient use a system known as e-OSCAR to send and receive ACDV's and AUD's. As defined in the AGNY Settlement on page 9 of 41 (Exhibit B), "e-OSCAR shall mean the 'Online Solution for Complete and Accurate Reporting,' a browser-based system for conveying consumer disputes to furnishers and for furnishers to convey the results of their investigation to the CRAs, designed in part in furtherance of compliance with the FCRA, 15 U.S.C. § 1681i(a)(5)(D)."

145.   When Experian receives a dispute regarding the accuracy of a credit report an ACDV will be completed by Experian and sent, via the e-OSCAR system, to the furnisher of the credit information that is in dispute.

146.   Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) reports the Navient Payment History for Sep 2015 as 90 days past due but reports the Aug 2015 as current.

147.   Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) reports the Navient Payment History for Aug 2014 as 90 days past due but reports the Jul 2014 as current.

148.   A tradeline must first be reported as 30 and 60 days past due before reporting that the tradeline is 90 days past due.

149.   On January 21, 2020, a dispute letter (Exhibit J-1) was sent to Experian.

150. Experian signed for the January 21, 2020 dispute letter on January 27, 2020 (Exhibit J-2).

151. Experian's response was to send a February 13, 2020 Dispute Results Report #3061xxx (Exhibit A-10)

152. Experian's February 13, 2020 Dispute Results Report #3061xxx (Exhibit A-10) for Navient Tradeline #xxx2002 reports: "Outcome: Updated – and the information you disputed has been updated."

153. The AGNY Settlement states on Pages 30 and 31 of 41 Section III Affirmative Obligations and Prohibitions – E. Furnishing Monitoring – 4. Functions of the Working Group (Exhibit B)

> a.      Coordinate and Review Furnisher Analytics and Metric: The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to: on an industry basis (e.g., collections, student loans); on a time-series basis by industry (i.e., a trending analysis that examines data over an extended time period); and/or in the form of benchmarking reports. These reports and metrics may include, but are not limited to, the following topics and purposes:
>
> v.      Proposed changes to the CRA's existing policies and procedures related to data accuracy and furnisher monitoring based on any areas of concern and/or best practices identified by the working Group pursuant to Section III.E.4.b.
>
> b.      Identify Data Accuracy Best Practices: The Working Group shall discuss each CRA's policies and procedures pertaining to data accuracy and furnishers in order to identify best practices. The Working Group's discussion may include, but be not limited to, topics addressed in Sections III. A and B above, including: minimum identification elements on newly opened trade and collection data; uniform standards regarding the collection of public record data; additional types of consumer disputes that warrant escalated handling; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; and other policies and procedures designed to enhance data quality. The Working Group shall identify potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy.

154. Experian failed to have policies and procedures in place to prevent the inaccurate reporting of the Payment History Sections in the Navient Tradeline #xxx2002.

155. Experian failed to monitor Navient for data quality and accuracy.

156.   Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1) reports the Navient Tradeline #xxx2002 is a joint account with Albert F. Davenport.

157.   Experian's February 24, 2020 Albert F. Davenport Dispute Results Report #1988xxx (Exhibit K-2) deletes the Navient Tradeline #xxx2002.

158.   Experian's February 13, 2020 Dispute Results Report #3061xxx (Exhibit A-10) for Davenport reports the Navient Tradeline #xxx2002 as a joint account with Albert F. Davenport.

159.   Experian's February 29, 2020 Dispute Results Report #2392xxx (Exhibit A-11) for Davenport reports the Navient Tradeline #xxx2002 as a joint account with Albert F. Davenport.

160.   Experian failed to have procedures and policies in place to accurately report the Navient Tradeline #xxx2002 accurately for joint account holders, Davenport and her husband Albert F. Davenport.

161.   Bobby Baker's May 28, 2020 faxed response letter (Exhibit G-3) states: "Additionally, our records indicate that we previously conducted a reinvestigation regarding the Navient account. The creditor verified the accuracy of the account. Results of the reinvestigations were provided directly to your client. "

162.   Experian's May 28, 2020 Important Information Report #1326xxx (Exhibit A-13) states: "Unless you send us additional relevant information to support your claim, we will not reinvestigate this information again."

163.   The AGNY Settlement states on page 23 of 41 (Exhibit B):

Subject to Section III.B.8.b below, each CRA shall utilize a process designed to assure that during a CRA's reinvestigation of a dispute of any item of information contained in a consumer's file, if a consumer submits Supporting Dispute Documentation and the CRA does not otherwise modify the information in the manner requested by the consumer, the Support Dispute Documentation shall be reviewed by an agent of the CRA with discretion to make a determination whether

to make the change requested by the consumer on the basis of the Supporting
Dispute Documentation.

164.   Experian was provided the Supporting Dispute Documentation / relevant information that it deleted the Navient Tradeline #xxx2002 (Exhibit K-2) for the joint holder, Albert F. Davenport (Davenport's husband) but continued to report the Navient Tradeline #xxx2002 for Davenport.

165.   Experian has violated its AGNY Settlement by failing to review the Supporting Dispute Documentation to determine that the Navient Tradeline #xxx2002 should be deleted because the Navient Tradeline #xxx2002 was deleted for the joint holder, Albert F. Davenport (Davenport's husband).

166.   Experian reported the Navient Tradeline #xxx2002 in Davenport's May 28, 2020 Experian Experian Credit Report #1326xxx (Exhibit A-12) while reporting the deletion of the Navient Tradeline #xxx2002 in Albert F. Davenport's February 24, 2020 Experian Dispute Results Report #1988xxx (Exhibit K-2).

167.   Experian cannot report a tradeline to one joint holder as accurate and report the same tradeline as deleted to another joint holder.

168.   Upon information and belief, Experian's EPC Sorter Manual describes how to sort the incoming mail.

169.   Upon information and belief, Experian's sorters check the verbiage on an imaged correspondence to determine if the request or information is related to a Consumer Affairs Special Services (hereinafter referred to as "CASS") issue.

170.   Upon information and belief, lawsuit complaints and requests for compensation or settlement received directly from attorneys are CASS related issues and correspondences.

171. An April 27, 2020 letter (Exhibit G-1) was sent to Experian's Group General Counsel, Darryl Gibson.

172. Experian picked up the April 27, 2020 letter on April 30, 2020 as per the USPS Tracking (Exhibit G-2).

173. Bobby Baker's May 28, 2020 faxed response letter (Exhibit G-3) states: "Additionally, our records indicate that Bureau of Account Management, Capio Partners, LLC, Portfolio Recovery Associates and JPMCB Card accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

174. Experian did not send a current Experian credit report, it sent a May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12).

175. Experian's CASS system did not provide a response to the April 27, 2020 letter (Exhibit G-1) that requested compensation and/or settlement for Experian's FCRA violations that were committed as outlined in the April 27, 2020 letter.

176. Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the April 27, 2020 letter (Exhibit G-1) because there is no response to the April 27, 2020 settlement offer.

177. Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the disputes referenced in the April 27, 2020 letter (Exhibit G-1).

178.   Experian's response ignores that the Navient Tradeline #xxx2002 is being reported for joint holder of the tradeline, Davenport, but Experian has deleted the Navient Tradeline #xxx2002 for the other joint holder, Albert F. Davenport (husband of Davenport).

179.   Experian's "parroting" the information provided by Navient may be considered a willful violation of the FCRA as the court opined in **_Campbell v. Chase Manhattan Bank, USA, N.A._**, No. 02-3489, 005 WL 1514221, 16 (D. N.J. June 2005):

> "…parroting information received from original source
> may be considered a willful violation of the FCRA."

### VIII. FACTUAL ALLEGATIONS AS TO EXPERIAN'S FLAWED INVESTIGATION INTO DAVENPORT'S INACCURATE CREDIT INFORMATION CLAIM REGARDING PORTFOLIO RECOVERY ASSOCIATES

180.   Experian's practices related to compiling and distributing consumer credit information are governed by the FCRA. The FCRA requires Experian to maintain reasonable procedures to assure maximum possible accuracy of consumer credit information. 15 U.S.C. § 1681e.

181.   Title 15 U.S.C. § 1681i authorizes Davenport to dispute information in her credit report.

182.   When a dispute is made, Experian must conduct a reasonable reinvestigation of disputed information. In conducting a reinvestigation of disputed information, Experian is required to "review and consider all relevant information submitted by the consumer" with respect to such disputed information. 15 U.S.C. § 1681i(a)(4). If, after a reinvestigation, the information is found to be inaccurate, incomplete or cannot

be verified, Experian must promptly delete or modify the information as appropriate. 15 U.S.C. §1681i(a)(5).

183.   As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "ACDV" shall mean Automated Credit Dispute Verification, an automated dispute form that is initiated by a credit reporting agency on behalf of a consumer and routed to the appropriate furnisher for review and update or verification.

184.   As defined in the AGNY Settlement on page 8 of 41 (Exhibit B) an "AUD" shall mean Automated Universal Data, an automated form used for out-of-cycle credit history updates that is initiated by the furnisher.

185.   Experian and Portfolio Recovery Associates (hereinafter referred to as "PRA") use a system known as e-OSCAR to send and receive ACDV's and AUD's. As defined in the AGNY Settlement on page 9 of 41 (Exhibit B), "e-OSCAR shall mean the 'Online Solution for Complete and Accurate Reporting,' a browser-based system for conveying consumer disputes to furnishers and for furnishers to convey the results of their investigation to the CRAs, designed in part in furtherance of compliance with the FCRA, 15 U.S.C. § 1681i(a)(5)(D)."

186.   When Experian receives a dispute regarding the accuracy of a credit report an ACDV will be completed by Experian and sent, via the e-OSCAR system, to the furnisher of the credit information that is in dispute.

187.   On October 9, 2019, a dispute letter (Exhibit L) was sent to Experian regarding PRA Tradelines #21170xxx and #47912xxx.

188.   The October 9, 2019 dispute letter (Exhibit L) concerned the inaccurate reporting of Defendants' Tradelines #21170xxx and #47912xxx and the failure to report PRA's Tradelines #41150xxx and #52910xxx.

189.   After receiving the October 9, 2019 dispute letter (Exhibit L), it is believed that Experian sent ACDVs to PRA for PRA Tradelines #21170xxx, #47912xxx, #41150xxx and #52910xxx.

190.   After receiving the PRA' response ACDVs, Experian sent a November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2) that reports: "Here are your results – Credit Items – Portfolio Recov Assoc 479124709241 – Outcome: Updated."

191.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2) did not report PRA Tradeline #21170xxx (World Finance Network Bank).

192.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2) did not report PRA Tradeline #52910xxx (Capital One Bank USA N.A.).

193.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2) reports the PRA Tradeline #41150xxx (Capital One Bank USA N.A.) and PRA Tradeline #47912xxx (Capital One Bank USA N.A.).

194.   Experian's November 26, 2019 Dispute Results Report #1714xxx (Exhibit A-3) reports PRA Tradelines #41150xxx and #47912xxx.

195.   Experian's November 26, 2019 Dispute Results Report #1714xxx (Exhibit A-3) did not report PRA Tradelines #21170xxx and #52910xxx.

196.   Experian's November 26, 2019 Dispute Results Report #0908-5963-85 (Exhibit A-4) reports PRA Tradelines #41150xxx and #47912xxx.

197.    Experian's November 26, 2019 Dispute Results Report #0908xxx (Exhibit A-4) did not report PRA Tradelines #21170xxx and #52910xxx.

198.    On November 27, 2019, a dispute letter (Exhibit M-1) was sent to Experian regarding the PRA Tradelines.

199.    Experian signed for the November 27, 2019 dispute letter on December 3, 2019 (Exhibit M-2).

200.    In response, Experian's employee, Bobby Baker, sent a December 16, 2019 faxed letter (Exhibit N-1) that states: "Our records indicate the World Finance Network Bank and Capital One Bank USA, N.A. accounts do not appear on your client's current Experian credit reports. We have mailed a current Experian credit report directly to your client for review.

201.    Experian did not send a current Experian credit report, it sent a December 16, 2019 Dispute Results Report #2386xxx (Exhibit A-5).

202.    Experian's December 16, 2019 Dispute Results Report #2386xxx (Exhibit A-5) did not report PRA Tradelines #21710xxx; #41150xxx; #47912xxxx and #52910xxx.

203.    The following review compares Experian's reporting of the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx:

| PRA Tradeline Number | 9/24/19 Experian #1709xxx Ex. A-1 | 11/6/19 Experian #3456xxx Ex. A-2 | 11/26/19 Experian #1714xxx Ex. A-3 | 11/26/19 Experian #0908xxx Ex. A-4 | 12/16/19 Experian #2386xxx Ex. A-5 |
|---|---|---|---|---|---|
| 21710x | Reported | Not Reported | Not Reported | Not Reported | Not Reported |
| 41150x | Not Reported | Reported | Reported | Reported | Not Reported |
| 47912x | Reported | Reported | Reported | Reported | Not Reported |
| 52910x | Not Reported | Not Reported | Not Reported | Not Reported | Not Reported |

204.    On December 19, 2019, a dispute letter (Exhibit O) was faxed to Experian regarding the DOFD; the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and

#52910xxx; and why PRA Tradelines #41150xxx and #52910xxx were not reported in Experian's September 24, 2019 Credit Report #1709xxx (Exhibit A-1).

205.    In response, Bobby Baker sent a January 10, 2020 faxed letter (Exhibit N-2) that states: "Our records indicate that the Tradeline Accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

206.    Experian did not send a current Experian credit report, it sent a January 10, 2020 Dispute Results Report #1582xxx (Exhibit A-7).

207.    Experian's January 10, 2020 Dispute Results Report #1582xxx (Exhibit A-7) did not report the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx.

208.    A January 21, 2020 dispute letter (Exhibit P) was faxed to Bobby Baker.

209.    The January 21, 2020 faxed letter (Exhibit P) outlined Bobby Baker's failure to provide the requested information.

210.    In response, Bobby Baker sent a February 3, 2020 faxed letter (Exhibit N-3) and faxed the same letter with a date of February 10, 2020 (Exhibit N-4) that state: "Our records indicate that the Tradeline accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

211.    Experian did not send a current Experian credit report, it sent a February 3, 2020 Dispute Results Report #3061xxx (Exhibit A-8) and a February 10, 2020 Dispute Results Report #0780xxx (Exhibit A-9).

212.    Experian's February 3, 2020 Dispute Results Report #3061xxx (Exhibit A-8) did not report the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx.

213.   Experian's February 10, 2020 Dispute Results Report #0780xxx (Exhibit A-9) did

not report the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx.

214.   Bobby Baker's February 3, 2020 and February 10, 2020 letters state:

> According to the air Credit Reporting Act (FCRA), a national consumer credit
> reporting agency's role in the dispute process is to review the accuracy and
> completeness of any disputed item which may include contacting the furnisher
> of the information or the vendor that collected the information...notifying
> them of the disputed information and disclosing all relevant information
> regarding the consumers dispute.

215.   Pursuant to the AGNY Settlement on Page 12 of 41 Section III Affirmative

Obligations and Prohibitions – B The Dispute Process – 6. Enhancing e-OSCAR

Furnisher Certifications and Terms of Use (Exhibit B), Experian's responsibility is to

review and update the terms of use agreed to by PRA using e-OSCAR as well as the

ACDV and AUD certifications made by PRA through e-OSCAR.

216.   Upon information and belief, on or about November 6, 2019, PRA sent an ACDV

for PRA Tradeline #47912xxx and an ACDV for PRA Tradeline #41150xxx that

verified the accuracy of its tradelines.

217.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2)

reports a dispute result for only PRA Tradeline #47912xxx.

218.   Experian's November 6, 2019 Dispute results Report #3456xxx (Exhibit A-2) for

PRA Tradeline #47912xxx reports: "Here are your results – Credit Items – Portfolio

Recov Assoc 47912xxx...Outcome: Updated – The item you disputed has been

updated, which may include an update to the disputed information."

219.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2)

reports in the comment section of PRA Tradeline #47912xxx: "Completed

investigation of FCRA dispute – consumer disagrees."

220.   Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2) reports in the comment section of PRA Tradeline #41150xxx: "Account information disputed by consumer (Meets requirement of the Fair Credit Reporting Act)."

221.   PRA's November 27, 2019 letter (Exhibit Q-1) for PRA Tradeline #41150xxx verified the validity of its tradeline.

222.   PRA's November 27, 2019 letter (Exhibit Q-2) for PRA Tradeline #47912xxx verified the validity of its tradeline.

223.   Upon information and belief, between November 28, 2019 and December 16, 2019, PRA issued AUDs to Experian deleting PRA Tradelines #47912xxx and #41150xxx.

224.   Experian's December 16, 2019 Dispute Results Report #2386xxx (Exhibit A-5) did not report the PRA Tradelines #47912xxx and #41150xxx.

225.   Within thirty (30) days of Experian reporting the PRA Tradelines #47912xxx and #41150xxx, Experian stops reporting PRA Tradelines #47912xxx and #41150xxx.

226.   Upon information and belief, PRA deleted its tradelines #47912xxx and #41150xxx because it could not document or verify the debts.

227.   PRA agreed to stop reporting debts that it could not document or verify to the CRAs as part of its November 2019 $4,000,000.00 settlement agreement with the Attorney General of Massachusetts.

228.   Upon information and belief, Experian's and PRA's ACDVs will provide the documentation that it was or was not PRA that verified the accuracy of the information that was contained in its Tradelines #41150xxx and #47910xxx as

reported in Experian's November 6, 2019 Dispute Results Report #3456xxx (Exhibit A-2).

229.    Upon information and belief, Experian and PRA's ACDVs and/or AUDs will document the date that PRA initially reported its Tradeline #21710xxx to Experian.

230.    Upon information and belief, Experian and PRA's ACDVs and/or AUDs will document the date that PRA initially reported its Tradeline #5291xxx to Experian.

231.    Upon information and belief, Experian's EPC Sorter Manual describes how to sort the incoming mail.

232.    Upon information and belief, Experian's sorters check the verbiage on an imaged correspondence to determine if the request or information is related to a Consumer Affairs Special Services (hereinafter referred to as "CASS") issue.

233.    Upon information and belief, lawsuit complaints and requests for compensation or settlement received directly from attorneys are CASS related issues and correspondences.

234.    An April 27, 2020 letter (Exhibit G-1) was sent to Experian's Group General Counsel, Darryl Gibson.

235.    Experian picked up the April 27, 2020 letter on April 30, 2020 as per the USPS Tracking (Exhibit G-2).

236.    Bobby Baker's May 28, 2020 faxed response letter (Exhibit G-3) states: "Additionally, our records indicate that Bureau of Account Management, Capio Partners, LLC, Portfolio Recovery Associates and JPMCB Card accounts do not appear on your client's current Experian credit report. We have mailed a current Experian credit report directly to your client for review."

237.   Experian did not send a current Experian credit report, it sent a May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12).

238.   Experian's CASS system did not provide a response to the April 27, 2020 letter (Exhibit G-1) that requested compensation and/or settlement for Experian's FCRA violations that were committed as outlined in the April 27, 2020 letter.

239.   Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the April 27, 2020 letter (Exhibit G-1) because there is no response to the April 27, 2020 settlement offer.

240.   Bobby Baker's May 28, 2020 letter (Exhibit G-3) and Experian's May 28, 2020 Dispute Results Report #1326xxx (Exhibit A-12) failed to respond to the disputes referenced in the April 27, 2020 letter (Exhibit G-1).

241.   The AGNY Settlement states on Pages 30 and 31 of 41 Section III Affirmative Obligations and Prohibitions – E. Furnishing Monitoring – 4. Functions of the Working Group (Exhibit B):

> a.        Coordinate and Review Furnisher Analytics and Metric: The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to: on an industry basis (e.g., collections, student loans); on a time-series basis by industry (i.e., a trending analysis that examines data over an extended time period); and/or in the form of benchmarking reports. These reports and metrics may include, but are not limited to, the following topics and purposes:
> v.        Proposed changes to the CRA's existing policies and procedures related to data accuracy and furnisher monitoring based on any areas of concern and/or best practices identified by the working Group pursuant to Section III.E.4.b.
> b.        Identify Data Accuracy Best Practices: The Working Group shall discuss each CRA's policies and procedures pertaining to data accuracy and furnishers in order to identify best practices. The Working Group's discussion may include, but not be limited to, topics addressed in Sections III. A and B above, including: minimum identification elements on newly opened trade and collection data; uniform standards regarding the collection of public record data; additional types of consumer disputes that warrant escalated handling; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; and other policies and procedures designed to enhance data quality. The Working Group shall identify

potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy.

242.    Experian failed to monitor PRA for data quality and accuracy.

243.    Experian failed to implement policies and procedures to monitor the performance of PRA in order to insure maximum possible accuracy in reporting the PRA tradelines.

244.    Experian failed to implement policies and procedures based on the recommendations of the Working Group and/or Experian's initiative.

245.    Experian failed to report all the PRA tradelines in its September 24, 2019 Credit Report #1709xxx compared to TransUnion's September 18, 2019 Report Number 3840xxx (Exhibit R) reporting the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx:

| PRA Tradeline Number | 9/24/19 Experian #1709xxx Ex. A-1 | 9/18/19 TransUnion #3840xxx Ex. R |
|---|---|---|
| 21710x | Reported | Reported |
| 41150x | Not Reported | Reported |
| 47912x | Reported | Reported |
| 52910x | Not Reported | Reported |

246.    Experian's "parroting" the information provided by PRA may be considered a willful violation of the FCRA as the court opined in *Campbell v. Chase Manhattan Bank, USA, N.A.*, No. 02-3489, 005 WL 1514221, 16 (D. N.J. June 2005):

> "...parroting information received from original source may be considered a willful violation of the FCRA."

## IX. FACTUAL ALLEGATIONS AS TO DAVENPORT'S
## FCRA CLAIMS AGAINST EXPERIAN FOR INACCURATE REPORTING
## OF THE NATIONSTAR TRADELINE #60266XXX

247.    Experian's practices related to compiling and distributing consumer credit
information are governed by the FCRA. The FCRA requires Experian to maintain
reasonable procedures to assure maximum possible accuracy of consumer credit
information. 15 U.S.C. § 1681e.

248.    Title 15 U.S.C. § 1681i authorizes Davenport to dispute information in her credit
report.

249.    The Nationstar Tradeline #60266xxx was reported by Experian as follows:

| | 2/3/20 Experian #3061xxx Ex. A-8 | 2/10/20 Experian #0780xxx Ex. A-9 | 2/13/20 Experian #3061xxx Ex. A-10 | 2/29/20 Experian #2392xxx Ex. A-11 |
|---|---|---|---|---|
| Tradeline Number | | | | |
| Nationstar #60266xxx: | Reported | Reported | Not Reported | Reported |

250.    Experian did not report the Nationstar Tradeline #60266xxx in its February 13,
2020 Dispute Results Report #3061xxx (Exhibit A-10).

251.    Experian did report the Nationstar Tradeline #60266xxx in its February 3, 2020
Dispute Results Report #3061xxx (Exhibit A-8); February 10, 2020 Dispute Results
Report #0780xxx (Exhibit A-9); and February 29, 2020 Credit Report #2392xxx
(Exhibit A-11).

252.    Experian failed to have policies and procedures in place to prevent the inserting of
the Nationstar Tradeline #60266xxx in its February 29, 2020 Credit Report #2392xxx
(Exhibit A-11) after it did not report the Nationstar Tradeline #60266xxx in its
February 13, 2020 Dispute Results Report #3061xxx (Exhibit A-10).

253.    Experian failed to report to Davenport that the Nationstar Tradeline #60266xxx was not going to be reported in its February 13, 2020 Experian Dispute Results Report #3061xxx (Exhibit A-10).

254.    Experian failed to report to Davenport why it inserted the Nationstar Tradeline #60266xxx as reported in its February 29, 2020 Credit Report #2392xxx (Exhibit A-11) after it failed to report the Nationstar Tradeline #60266xxx in its February 13, 2020 Experian Dispute Results Report #3061xxx (Exhibit A-10).

### X. FACTUAL ALLEGATIONS AS TO DAVENPORT'S FCRA CLAIMS AGAINST EXPERIAN REGARDING THE REPORTING OF THIRTY- SEVEN (37) BAM TRADELINES, CPL TRADELINES #15810XXX AND #14161XXX, NAVIENT TRADELINE #XXXX2002, AND PRA TRADELINES #21170XXX, #41150XXX, #47912XXX AND #52910XXX

255.    Experian's actions do not comply with the standard found in *Curtis J. Collins v. Experian Information Solutions, Inc.*, 2:11-CV-938 (January 5, 2015):

> When a consumer disputes the completeness or accuracy of any information contained in her credit report, the consumer reporting agency must conduct a reinvestigation. If the reinvestigation reveals that the information is inaccurate or cannot be verified, the consumer reporting agency must promptly delete the information. 15 U.S.C. § 1681(i)(a). Failure to conduct a reasonable reinvestigation violates the FCRA. *Cushman v Trans Union Corp.*, 115 F.3d 220,223-24 (3rd Cir 1997).

256.    Experian knew that the pointless repetition of the ACDV / CDV procedures only served to delay resolving Davenport's dispute. The Court opined in *Apodaca v. Discovery Financial Services, Equifax Credit Information Services, Inc.*, 417 F. Supp. 2d 1220 (D.N.M. 2006):

> "Based on the evidence of record, a rational fact finder could conclude that Equifax knew the pointless repetition of the cursory CDV procedure by its various agents and contractors was not going to resolve Plaintiff's dispute in a timely manner and only served to delay the matter until Plaintiff tired of the process or proceeded to litigation."

257.   Under the FCRA, Experian was required to report accurate information and to conduct a proper investigation of disputed information. 15 U.S.C. §1681e(b) and 1681i(a).

258.   Experian has been warned of its inadequate FCRA practices and associated credit reporting practices by the Office of the New York Attorney General Eric T. Schneiderman in his investigation of Experian in March 2015 and the Mississippi Attorney General's investigation in *State of Mississippi ex rel., v. Experian Information Solutions, Inc.*, 1:14-CV-243.

259.   Experian failed to conduct a reasonable and adequate investigation/reinvestigation into Davenport's disputed credit reporting and continued to report false and inaccurate information to any potential credit grantor who accessed Davenport's credit report.

260.   Experian should have realized that the information being supplied to support the credit information for the thirty-seven (37) BAM tradelines were inaccurate and could not be verified.

261.   Experian should have realized that the information being supplied to support the credit information for the CPL Tradelines #15810xxx and #14161xxx were inaccurate and could not be verified.

262.   Experian should have realized that the information being supplied to support the credit information for the PRA Tradelines #21710xxx; #41150xxx; #47912xxx and #52910xxx were inaccurate and could not be verified..

263.    Experian should have realized that the information being supplied to support the credit information for the Navient Tradeline #xxx2002 were inaccurate and could not be verified.

264.    Experian has failed to maintain policies and procedures to insure the maximum possible accuracy of Davenport's credit report, information and file.

265.    Experian has willfully and/or negligently failed and/or refused to remove the inaccurate credit information pertaining to Davenport's credit history until dispute letters were sent to Experian.

266.    Experian simply parroted the information from the ACDV's and/or AUDs obtained by Experian's investigation and/or reinvestigations which led to Experian to issue the following credit reports / dispute results / important information report with inaccurate and conflicting information: (1) September 24, 2019 Report #1709xxx (Exhibit A-1); (2) November 11, 2019 Report #3456xxx (Exhibit A-2); (3) November 26, 2019 Report #1714xxx (Exhibit A-3); (4) November 26, 2019 Report #0908xxx (Exhibit A-4); (5) December 16, 2019 Report #2386xxx (Exhibit A-5); (6) January 8, 2020 Report #0240xxx (Exhibit A-6); (7) January 10, 2020 Report #1582xxx (Exhibit A-7); (8) February 3, 2020 Report #3061xxx (Exhibit A-8); (9) February 10, 2020 Report #0780xxx (Exhibit A-9); (10) February 13, 2020 Report #3061xxx (Exhibit A-10); (11) February 29, 2020 Report #2392xxx (Exhibit A-11); (12) May 28, 2020 Report #1326xxx (Exhibit A-12); and (13) May 28, 2020 Report #1326xxx (Exhibit A-13).

267.    Experian failed to conduct a reasonable and adequate investigation/reinvestigation into Davenport's disputed credit reporting and did not delete or correct the false

information but instead re-aged the dates on various tradelines and continued to report false and inaccurate information to any potential credit grantor who accessed Davenport's credit report.

268.    If Experian was following any, much less reasonable procedures to assure maximum accuracy, they would not allow such inaccurate reporting and once they were put on notice via the verifiable information provided by Davenport or the inaccurate and unverifiable information being provided by CPL, Navient and PRA, they should have fixed or corrected the false and misleading information.

269.    Experian's procedures are so bad or lacking that they continue to report obvious inaccurate data on Davenport's credit report with the knowledge that Experian could not verify the accuracy of the information obtained from the ACDVs and/or AUDs and/or notifications it received from BAM, CPL, Navient and PRA.

270.    Experian's re-aging and manipulating of the dates in Davenport's credit reports is falsely representing the character of various tradelines.

271.    Experian's re-aging and manipulating of the dates artificially lowered Davenport's credit score more than if the tradelines were being reported accurately.

272.    Experian's CASS system failed to properly respond to the April 27, 2020 letter (Exhibit G-1) that requested compensation and/or settlement for Experian's FCRA violations that were committed as outlined in the April 27, 2020 letter.

273.    Experian's policies and procedures failed to accurately report joint account holders' tradeline since Experian deleted the Navient Tradeline #xxx2002 from Davenport's husband's (Albert F. Davenport) credit report and file but continued to report the Navient Tradeline #xxx2002 in Davenport's credit report and file.

274.   Experian reported Davenport with a credit score of 726 (Exhibit S) with the following inaccurate negative comments: (1) code #10 – Proportion of balance to high credit on bank revolving or all revolving accounts; (2) code #15 – lack of recent bank/national revolving information; (3) code #18 – number of accounts with delinquency; (4) code #09 – too many accounts recently open which were used to base a credit denial for Davenport's mortgage on November 19, 2020.

275.   Davenport's credit score was adversely affected as a result of Experian's conduct in reporting negative tradelines.

276.   As a result of Experian's willful, wanton, reckless, and/or negligent action, Davenport has been damaged.

277.   Experian acted with actual malice in willfully continuing to report inaccurate and misleading information on Davenport's credit, knowing full well that other creditors were accessing the Davenport's credit report, all to Davenport's determent and loss.

278.   As a result of Experian's conduct, Davenport has suffered actual damages and serious financial harm arising from monetary loses relating to credit denials, loss of use of funds, loss of credit and loan opportunities, excessive and/or elevated interest rate and finance charges, and legal fees and court costs, all which will continue into the future to Davenport's detriment and loss.

279.   As a result of Experian's conduct, Davenport has suffered great physical emotional and mental pain and anguish, and Davenport will continue to suffer the same for an indefinite time into the future, all to Davenport's great detriment and loss.

280.   As a result of Experian's conduct, Davenport has suffered actual damages in the form of financial and dignitary harm arising from the injury to credit rating and

reputation, and Davenport will continue to suffer the same for an indefinite time into the future, all to Davenport's great detriment and loss.

281.   As a result of Experian's conduct, Davenport has suffered a decreased credit score as a result of the inaccurate information and inquiries appearing on Davenport's credit file.

282.   At all times relevant hereto, Experian was acting by and through its agents, servants and/or employees who were acting within the course and the scope of their agency or employment, and under the direct supervision and control of the Experian herein.

283.   At all times relevant hereto, the conduct of Experian, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and grossly negligent disregard for federal and state laws and the rights of Davenport herein.

284.   Davenport has suffered mental anguish, emotional distress, worry, humiliation and embarrassment as a result of Experian's actions.

## COUNT I – VIOLATIONS OF THE FCRA
## AS TO EXPERIAN

285.   Davenport incorporates by reference the allegations in ¶1-¶284 as though fully set forth.

286.   At all times pertinent hereto, Experian was a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(b) and (f).

287.   At all times pertinent hereto, Davenport was a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

288.   At all times pertinent hereto, the above mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. §1681a(d)

289.   Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Experian is liable to the Davenport for engaging in the following conduct: (a) willfully and negligently failing to delete the inaccurate information from Davenport's credit file after reinvestigation, in violation of 15 U.S.C. §1681i(a); (b) willfully and negligently failing to employ and follow reasonable procedures to assure maximum possible accuracy of Davenport's credit report, information and file, in violation of 15 U.S.C. §1681e(b); (c) willfully and negligently failing to properly and timely delete the inaccurate information from Davenport's credit files despite being unable to verify the accuracy of the information and/or being provided with proof of its inaccuracy; and (d) willfully and negligently continuing to furnish and disseminate inaccurate information and derogatory credit account and other information despite having knowledge of its inaccuracy and/or inability to be verified.

290.   The conduct of Experian was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to Davenport that are outlined more fully above and, as a result, Experian is liable to Davenport for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

  **WHEREFORE,** Davenport respectfully requests that this court enter judgment in her favor and against Experian for the following:

  a.   Actual Damages;

  b.   Punitive Damages;

  c.   Statutory damages pursuant to 15 U.S.C. §1681n;

d.  Reasonable attorney's fees and costs of suit pursuant to 15 U.S.C. §1681o; and

e.  Such addition and further relief as may be appropriate or that the interests of justice require.

<b><u>COUNT II – NEGLIGENCE AS TO EXPERIAN</u></b>

291.  Davenport incorporates by reference the allegations in ¶1-¶290 as though fully set forth.

292.  Experian's negligence consists of the following:

a.  Violating the FCRA as set forth above;

b.  Failing to provide a proper and reasonable reinvestigation concerning the inaccurate information after receiving notice of the dispute from Davenport;

c.  Failing to provide prompt notice of the inaccurate information and Davenport's dispute to creditors;

d.  Failing to provide all relevant information provided by Davenport regarding the dispute of the inaccurate information to creditor;

e.  Failing to review and consider all relevant information submitted by Davenport regarding the dispute of the inaccurate information;

f.  Failing to delete or correct the inaccurate information from Davenport's credit file after reinvestigation;

g.  Failing to note Davenport's dispute of the inaccurate information on the initial consumer reports;

h.  Failing to timely and properly investigate the inaccurate information after receiving notice of the dispute from Davenport;

  i. Failing to employ and follow reasonable procedures to assure maximum possible accuracy of Davenport's credit report, information and file;

  j. Failing to properly and timely delete the inaccurate information from Davenport's credit files despite being unable to verify the accuracy of the information and/or being provided with proof of its accuracy;

  k. Continuing to report the inaccurate information despite having knowledge of the inaccuracies and/or the inability to be verified;

  l. Continuing to rely upon verification from a source it had reason to know was unreliable; and

  m. Continuing to re-age and manipulate the dates in Davenport's tradelines to artificially lower Davenport's credit score and to falsely represent the character of the Davenport's accounts / tradelines.

293. As a result of Experian's conduct as mentioned above, Davenport sustained and continues to sustain the losses and damages set forth above.

294. The conduct of Experian is a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, damages and harm to Davenport that are outlined more fully above and, as a result, Experian is liable to compensate Davenport for the full amount of actual and compensatory damages, as well as such other relief, permitted by law.

  **WHEREFORE,** Davenport respectfully requests that this court enter judgment in her favor and against Experian for the following:

  a. Actual Damages;

  b. Punitive Damages;

c.  Statutory damages pursuant to 15 U.S.C. §1681n;

d.  Reasonable attorney's fees and costs of suit pursuant to 15 U.S.C. §1681o; and

e.  Such addition and further relief as may be appropriate or that the interests of justice require.

Respectfully submitted,

By: _____
Steven Howell, Esquire
Howell Law Firm
619 Bridge Street
New Cumberland, PA 17070
(717) 770-1277 Phone
(717) 770-1278 Fax
hwllstvn@aol.com
Supreme Court ID 62063
Attorney for Plaintiff

## VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

I, Anniken U. Davenport, depose and say as follows:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorney and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this Civil Compliant is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil complaint in good faith and solely for the purpose set forth in it.
6. I have provided my attorney with true and correct copies of each and every exhibit, which has been attached to this Complaint.
7. I have not altered, changed, modified, or fabricated the attached exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

Date: _12-18-20_

_____
Anniken U. Davenport